IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

ROSA RONCALES,

        Plaintiff,

**REDACTED**

v.

Civil Action No. 3:19cv234

ANTHONY MCDOWELL, *et al.*,

        Defendants.

## MEMORANDUM OPINION

This matter comes before the Court on two motions:

(1)    Plaintiff Rosa Roncales's Motion for Partial Summary Judgment[1] ("Roncales Motion"), (ECF No. 49); and,

(2)    Defendants Anthony McDowell, Alec Oughton, Scotty Roberts, and Eugene Gerald's (collectively the "Defendants") Motion for Summary Judgment ("Defendants Motion," and collectively, with the Roncales Motion, the "Motions") (ECF No. 55).

The Parties each responded to the Motions, (ECF Nos. 63, 69), and replied, (ECF Nos. 66, 79.)

The Parties also filed supplemental responses to address late-filed discovery, (ECF Nos. 86, 87),

at the Court's direction.  (ECF No. 85.)

---

[1] Federal Rule of Civil Procedure 56(a) provides, in pertinent part:

(a) Motion for Summary Judgment or Partial Summary Judgment.  A party may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a).

These matters are ripe for disposition.  The Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid the decisional process.  The Court exercises jurisdiction pursuant to 28 U.S.C. § 1331.[2]

## I. Factual[3] and Procedural Background

Roncales brings this civil rights action pursuant to 42 U.S.C. § 1983[4] and the First[5] and Fourteenth Amendments[6] to the United States Constitution.  Following the Court's March 31, 2020 Memorandum Opinion, which granted in part the Defendants' Motion to Dismiss, (ECF

---

[2] "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.  Roncales brings her claims under the First Amendment and Fourteenth Amendments to the Constitution.  (Sec. Am. Compl. "SAC" 1, ECF No. 30.)

[3] In recounting the factual history, the Court relates the undisputed facts as articulated in the parties' briefing on both motions for summary judgment.  In3 ruling on each motion, the Court will view the undisputed facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

[4] Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, . . . injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983.

[5] The First Amendment states:  "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."  U.S. CONST. amend. I.

[6] The Fourteenth Amendment states:  "No State shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."  U.S. CONST. amend. XIV, § 1.

2

No. 36), only Roncales's First Amendment retaliation claim against Defendants in their individual capacities and Fourteenth Amendment due process claim against Fire Chief McDowell in his individual capacity remain.

### A.    **Factual Background**

Roncales's claims stem from the termination of her employment from the County of Henrico Division of Fire ("HDOF") in April 2017. Before her termination from the HDOF, Roncales had served as a firefighter for more than five years, first at the City of Petersburg Department of Fire, and then at the HDOF. (Roncales Mot. Partial Summ. J. Ex. 1 "Declaration of Rosa Roncales" ¶¶ 5–9, ECF No. 50-1 pp. 1–2.)[7] At all times relevant to her claims, Roncales has intended to pursue a career as a firefighter. (*Id.* ¶ 3, p. 1.)

### 1.    **Roncales's Early Career as a Firefighter**

In December 2010, Roncales applied for a position, and was hired, as a firefighter with the Petersburg Department of Fire, Rescue, and Emergency Services. (*Id.* ¶ 4, p. 1.) The Petersburg Fire Department required Roncales to list her former employers and, for each employer, the "Reason for Leaving." (Roncales Mot. Partial Summ. J. Ex. 2, "Rosa Roncales City of Petersburg Completed Employment Application," ECF No. 53 pp. 3–4.)

Four years later, on February 13, 2015, Roncales obtained her associate degree in Fire Science, completing the program with a 4.0 grade point average. (Roncales Mot. Partial Summ. J. Ex. 1, "Declaration of Rosa Roncales," ¶ 6, ECF No. 50-1 p. 1; Roncales Mot. Partial Summ.

---

[7] For ease of readability, and because there is much duplication in the record, the Court will refer only to Defendants' exhibits when they match Plaintiff's exhibits because Defendants are moving for summary judgment on both counts and Plaintiff is only moving for summary judgment on Count II. Where materials are only available in Plaintiff's exhibits, the Court will refer to those. Additionally, paragraph (¶) citations appear only for affidavits and declarations; otherwise, page numbers in citations refer to the page number of the Electronic Case File (ECF) document.

J. Ex. 3, "███████████████████Degree and Unofficial Transcript," ECF No. 53-1.)

That same year, in 2015, Roncales applied for a position as a firefighter with the HDOF.

(Roncales Mot. Partial Summ. J. Ex. 1, "Declaration of Rosa Roncales," ¶¶ 8–9, ECF No. 50-1 p.

2.)  As part of the HDOF application process, Roncales was "required to complete an

employment application and 'Personal History Questionnaire.'" (*Id.* ¶ 11, p. 2.)  As had the

Petersburg Fire Department, the HDOF asked "[m]ay we contact your former employers" and

"current employer" as part of the application process.  (Roncales Mot. Partial Summ. J. Ex. 4,

"Rosa Roncales Henrico County Division of Fire Completed Employment Application and

Personal History Questionnaire," ECF No. 53-2 pp. 1–2.)

When HDOF hired Roncales in 2015, Anthony McDowell served as the Fire Chief.

(Roncales Mot. Partial Summ. J. Ex. 1, "Declaration of Rosa Roncales," ¶ 13, ECF No. 50-1 p.

2.)  In 2016, HDOF evaluated Roncales in 18 categories, giving her nine "five" and nine "four"

ratings, resulting in an average rating of 4.5.[8]  (Roncales Mot. Partial Summ. J. Ex. 7, "Henrico

Fire Quarterly Probationary Report," ECF No. 53-3 p. 1.)  Her supervisor, Company Officer

Ralph Whaley, commented that Roncales "has shown good comprehension and knowledge of the

job" and "will continue to be a valuable asset to the [HDOF] for many years to come."  (*Id.* p. 2.)

### 2.   Circumstances Leading to Roncales's Termination

The events leading to the termination of Roncales's employment in April 2017 began in

November 2016, shortly after the presidential election.  (Roncales Mot. Partial Summ. J. Ex. 1,

"Declaration of Rosa Roncales," ¶¶ 15–16, ECF No. 50-1 p. 2.)  After the election, Roncales

posted on Facebook a graphic depicting a swastika draped in an American flag with a caption

quoting Sinclair Lewis that said:  "[w]hen fascism comes to America, it will be wrapped in a flag

---

[8] Possible ratings range from zero (unacceptable) to five (outstanding).  (Roncales Mot.
Partial Summ. J. Ex. 7, "Henrico Fire Quarterly Probationary Report," ECF No. 53-3 p. 1.)

and carrying a cross." (Defs.' Mot. Summ. J. Ex. 8 "Deposition of Rosa Roncales," ECF No. 59-27 pp. 8–9.)



(Pl. Opp. Defs.' Mot. Summ. J. Ex. 4 "Flag Graphic Facebook Post," ECF No. 69-2.)



(Defs.' Mot. Summ. J. Ex. 8-A, "Flag Graphic Facebook Post," ECF No. 56-15.)

5

According to Roncales, "two members of [Fire Chief McDowell's] chain of command" "verbally reprimand[ed]" her for her Facebook post. (Defs.' Mot. Summ. J. Ex. 8 "Deposition of Rosa Roncales," ECF No. 59-27 pp. 8–14.)  Fire Chief McDowell, District Chief Eugene Gerald, and Battalion Chief Scotty Roberts stated that they were not aware at the time of Roncales's Facebook post. (Defs.' Mot. Summ. J. Ex. 2 "Deposition of Anthony McDowell," ECF No. 56-6 p. 5; Defs.' Mot. Summ. J. Ex. 6 "Deposition of Eugene Gerald," ECF No. 56-13 p. 4; Defs.' Mot. Summ. J. Ex. 7 "Deposition of Scotty Roberts," ECF No. 56-14 pp. 3–4.)  Defendant Alec Oughton was sent the post "at some point." (Defs.' Mot. Summ. J. Ex. 4 "Deposition of Alec Oughton," ECF No. 56-11 p. 7.)

On January 20, 2017, Roncales and her domestic partner, Emeline Phipps, participated in a large political march and rally in Washington, D.C. in opposition to the inauguration of Donald Trump. (Roncales Mot. Partial Summ. J. Ex. 1 "Declaration of Rosa Roncales," ¶ 16, ECF No. 50-1 p. 2; Roncales Mot. Partial Summ. J. Ex. 8 "Declaration of Emeline Phipps," ¶ 3, ECF No. 50-4 p. 1.)  At the time, Roncales packed a bag of "travel essentials," which she recalls as including her "identification, keys, wallet, cell phone, clothing, including a hat and scarf, mace for personal safety, and toiletries." (Roncales Mot. Partial Summ. J. Ex. 1 "Declaration of Rosa Roncales," ¶ 20, ECF No. 50-1 p. 3.)  Roncales also remembers packing, in either her bag or Phipps's, a first aid kit and two respirators that she owned and had previously used "to remove insulation under [her] house." (*Id.* ¶ 21, p. 3.)  The respirators are shown here:

 

(Defs.' Mot. Summ. J. Ex. 19 "Pictures of Respirators," ECF No. 56-21 pp. 5–6.) Roncales

packed the respirators for her "personal safety and the safety of others." (Roncales Mot. Partial

Summ. J. Ex. 1 "Declaration of Rosa Roncales," ¶ 21, ECF No. 50-1 p. 3.)

The march garnered a strong D.C. Metropolitan Police Department presence. (*Id.* ¶ 28, p.

4.) Law enforcement ultimately confined, arrested, and charged multiple individuals, including

Roncales, who received charges for, among other offenses, "felony rioting offenses and property

damage and destruction."[9] (*Id.* ¶ 31, p. 4.) Roncales spent 37 hours in jail following her arrest.

(*Id.* ¶ 35, p. 4.) The D.C. Metropolitan Police Department later dismissed with prejudice the

criminal charges against Roncales. (Roncales Mot. Partial Summ. J. Ex. 9 "Superior Court of the

---

[9] Roncales was indicted for "inciting or urging to riot (in violation of D.C. Code § 22-1322(d)), rioting (in violation of D.C. Code § 22-1322(b) and (d)), conspiracy to riot (in violation of D.C. Code §§ 22-1322(b) and 22-1805(a), five counts of destruction of property (in violation of D.C. Code § 22-303) and misdemeanor assault on a police officer (APO) charge (in violation of D.C. Code § 22-405(b))." (Roncales Mot. Partial Summ. J. Ex. 10 "Order to Seal Criminal Records on Grounds of Actual Innocence," ECF No. 50-6 p. 1.)

District of Columbia Criminal Cases Order of Dismissal With Prejudice March 29, 2019," ECF No. 50-5 pp. 4–5.)

Approximately eight months later, on September 23, 2019, the Superior Court of the District of Columbia entered an order to seal Roncales's arrest and criminal records on grounds of "actual innocence," declaring that "Roncales has demonstrated . . . that she did not commit any offense that occurred on January 20, 2017, for which she was arrested and prosecuted." (Roncales Mot. Partial Summ. J. Ex. 10 "Order to Seal Criminal Records on Grounds of Actual Innocence," ECF No. 50-6 p. 2.)

At the time of the march and Roncales's arrest, Defendant Anthony McDowell served as HDOF's Fire Chief, and Defendant Alec Oughton served as Deputy Chief of Operations.  (Defs.' Mot. Summ. J. Ex. 1 "Affidavit of Anthony McDowell," ¶ 1, ECF No. 56-1 p. 1; Defs.' Mot. Summ. J. Ex. 3 "Affidavit of Alec Oughton," ¶ 1, ECF No. 56-7 p. 1.)  HDOF policy required Roncales to report her arrest to her supervisor, Captain Ronnie Thomas, which she did on January 23, 2017.  (Roncales Mot. Partial Summ. J. Ex. 1 "Declaration of Rosa Roncales," ¶ 35, ECF No. 50-1 p. 4; Defs.' Mot. Summ. J. Ex. 8 "Deposition of Rosa Roncales," ECF No. 59-27 p. 21.)  Although Roncales asked Captain Thomas to keep her arrest confidential, she maintains that this information "was disseminated to the public." (Roncales Mot. Partial Summ. J. Ex. 1 "Declaration of Rosa Roncales," ¶ 37, ECF No. 50-1 p. 4.)  On January 26, 2017, the media reported Roncales's arrest.  (Defs.' Mot. Summ. J. Ex. 1 "Affidavit of Anthony McDowell," ¶ 12, ECF No. 56-1 p. 3.)  That same day, Fire Chief McDowell emailed Deputy Chief Oughton a New York Times article about journalists being arrested at Trump's inauguration, stating that "[i]f Roncales engaged in criminal behavior we must take decisive action and she'll find no quarter from me.  If, however, she was simply a lawful protester who did nothing wrong, she

8

(and our department) will have been severely mistreated by our local media." (Defs.' Mot. Summ. J. Ex. 1-B "Email from Tony McDowell to Alec Oughton and Lee Ann Anderson January 27, 2017," ECF No. 56-3.)

On January 27, 2017, Fire Chief McDowell emailed Paula Reid, HDOF's Human Resources Director, informing her of an upcoming investigation of Roncales's arrest. (Defs.' Mot. Summ. J. Ex. 1-D "Email from Paula Reid to Tony McDowell January 27, 2017," ECF No. 56-5.) Fire Chief McDowell predicted that Roncales would "tell [them] that she was in the vicinity, part of a crowd, but not personally involved in any acts of violence." (*Id.*) Fire Chief McDowell noted that he "did not plan to impose any discipline until we can prove (or she admits) to breaking a law or violating one of [HDOF's] policies/procedures." (*Id.*) Fire Chief McDowell further explained that if Roncales "admits to having played a direct role in any vandalism or violent acts of any kind, or any crime against persons," he would "like permission to suspend her without pay." (*Id.*)

On January 29, 2017, nine days after the march, Captain Taylor Goodman, who was the HDOF's press relations person at that time, informed Fire Chief McDowell and Deputy Chief Oughton that the HDOF was being "decimated in the comments section" of the Department of Fire Facebook page. (Roncales Mot. Partial Summ. J. Ex. 17 "Email from Taylor Goodman to Tony McDowell and Alec Oughton January 29, 2017," ECF No. 50-13.)

### 3.    Roncales's Supervisors Investigate Her Arrest

HDOF initiated an investigation to determine whether Roncales had violated department policy after she disclosed her arrest. (Defs.' Mot. Summ. J. Ex. 2 "Deposition of Anthony McDowell," ECF No. 56-6 p. 1; Defs.' Mot. Summ. J. Ex. 4 "Deposition of Alec Oughton," ECF No. 56-11 pp. 2–3.) Roncales was "re-assigned to an administrative position" on January 27,

2017. (Roncales Mot. Partial Summ. J. Ex. 13 "Email from Tony McDowell to Tony McDowell January 27, 2017," ECF No. 50-9.) Department policy allowed the Assistant Chief of Operations to temporarily transfer a firefighter to another assignment pending resolution of an investigation of criminal charges. (Defs.' Mot. Summ. J. Ex. 3 "Affidavit of Alec Oughton," ¶ 7, ECF No. 56-7 p. 3.) District Chief Eugene Gerald and Battalion Chief Scotty Roberts were assigned to investigate Roncales's arrest and "conduct the interrogation of" her. (Roncales Mot. Partial Summ. J. Ex. 13 "Email from Tony McDowell to Tony McDowell January 27, 2017," ECF No. 50-9.)

### a.    The January 30, 2017 Interview

On Monday, January 30, 2017, at 10:30 a.m., Roncales received an Inter-Office Memorandum (the "Inter-Office Memo") from Deputy Chief Oughton notifying her that she would be "questioned as part of an official administrative investigation" and "asked questions specifically directed and narrowly-related to the following: [o]ff duty conduct resulting in criminal charges on January 21, 2017." (Defs.' Mot. Summ. J. Ex. 3B "Inter-Office Memorandum from Alec Oughton to Rosa Roncales January 24, 2017," ECF No. 59-4.) The Inter-Office Memo included an Internal Investigation Warning, which stated that should Roncales "refuse to testify or to answer fully and truthfully . . . , [she] will be subject to charges which could result in [her] dismissal from the Division of Fire." (Defs.' Mot. Summ. J. Ex. 3D "First Internal Investigation Warning," ECF No. 59-5.)

Prior to receiving that memorandum, Roncales did not know that "an interrogation was to occur." (Roncales Mot. Partial Summ. J. Ex. 1 "Declaration of Rosa Roncales," ¶ 42, ECF No. 50-1 p. 5.) However, Roncales had spoken with her D.C. criminal defense attorneys who advised her "not make any statements regarding the events that took place on January 20th."

10

(Defs.' Mot. Summ. J. Ex. 8 "Deposition of Rosa Roncales," ECF No. 59-27 p. 32.)  After

receiving the memorandum and before the questioning began, Roncales "requested 24 hours to

speak with [her] attorney."  (Roncales Mot. Partial Summ. J. Ex. 1 "Declaration of Rosa

Roncales," ¶ 39, ECF No. 50-1 p. 5.)[10]  According to Roncales, the attorneys wanted "24 hours

to review the Garrity law, and to get acquainted with [her] case because they were new" but

District Chief Gerald and Battalion Chief Roberts instructed her that she had only until 2:00 p.m.

that day to subject herself to questioning or face termination.  (Defs.' Mot. Summ. J. Ex. 8

"Deposition of Rosa Roncales," ECF No. 59-27 p. 33.)

That afternoon (ten days after her arrest), District Chief Gerald and Battalion Chief

Roberts questioned Roncales about her participation in the march.  (Defs.' Mot. Summ. J. Ex. 5B

"Transcript of First Interrogation, Part 1," ECF No. 59-15; Defs.' Mot. Summ. J. Ex. 5D

"Transcript of First Interrogation, Part 2," ECF No. 59-17.)  District Chief Gerald and Battalion

Chief Roberts developed the questions they asked Roncales.  (Roncales Mot. Partial Summ. J.

Ex. 16 "Email from Scotty Roberts to Alec Oughton and Eugene Gerald January 28, 2017," ECF

No. 50-12.)  Deputy Chief Oughton offered no input on the questions.  (Defs.' Mot. Summ. J.

Ex. 4 "Deposition of Alec Oughton," ECF No. 56-11 p. 9; Defs.' Mot. Summ. J. Ex. 6

"Deposition of Eugene Gerald," ECF No. 56-13 p. 2.)  During the recess during which Roncales

was contacting her attorneys, District Chief Gerald commented to Battalion Chief Roberts about

Roncales's original statement that her attorneys had advised her not to speak about the events,

saying that "it's going to make it sticky if she don't [sic] come clean."  (Defs.' Mot. Summ. J.

---

[10] District Chief Gerald and Battalion Chief Roberts denied the request for a 24-hour
delay and instead allowed a short recess after the interrogation began for Roncales to speak with
her attorneys by telephone.  (Defs.' Mot. Summ. J. Ex. 8 "Deposition of Rosa Roncales," ECF
No. 59-27 p. 33; Defs.' Mot. Summ. J. Ex. 7 "Deposition of Scotty Roberts," ECF No. 56-14 p.
11; Defs.' Mot. Summ. J. Ex. 5B "Transcript of First Interrogation, Part 1," ECF No. 59-15 p. 5.)

Ex. 5B "Transcript of First Interrogation, Part 1," ECF No. 59-15 p. 6.)  District Chief Gerald

stated in his deposition that this statement meant that he hoped Roncales would agree to submit

to questioning and thereby avoid any disciplinary action that could result from refusing to

participate. (Defs.' Mot. Summ. J. Ex. 6 "Deposition of Eugene Gerald," ECF No. 56-13 pp. 7–

8.)  District Chief Gerald and Battalion Chief Roberts also told Roncales that Fire Chief

McDowell's "charge to [them] is you need to go in the station and hear that shit and nip it in the

bud." (Defs.' Mot. Summ. J. Ex. 5B "Transcript of First Interrogation, Part 1," ECF No. 59-15

p. 9.) They advised Roncales that if she refused to answer the questions, it could be considered

"insubordination." (*Id.* p. 3.)

     During the interview, Roncales described how she learned of the January 20, 2017 march.

(Defs.' Mot. Summ. J. Ex. 5D "Transcript of First Interrogation, Part 2," ECF No. 59-17 p. 4.)

████████████████████████████████████████

████████████████████████████ (*Id.* p. 5.)  District Chief Gerald and

Battalion Chief Roberts asked Roncales to "describe in detail [her] attire or dress, what [she was]

wearing or carrying during [her] participation." (*Id.* p. 6.)  Roncales stated that it "was cloudy

and rainy that day," ████████████████████████████████

████████████████ (*Id.*)  Roncales reported that she did not wear anything

associated with the HDOF. (*Id.* p. 7.)

     When questioned, Roncales admitted that she realized at some point that the march was

no longer peaceful, but stated that she did not feel safe leaving in light of the "strong police

presence" surrounding the march. (*Id.* pp. 9–11.)  Roncales denied that she took part in any

property damage or "in any way resist[ed] arrest or [took] any action of defiance against the

arresting police." (*Id.* pp. 12–13.)  At the end of the interview, Roncales informed District Chief

Gerald and Battalion Chief Roberts that Phipps, Roncales's partner who also attended the march, could corroborate her statements. (*Id.* p. 13.) Roncales maintains that she believes she "answered all interrogation questions truthfully and to the best of [her] memory." (Roncales Mot. Partial Summ. J. Ex. 1 "Declaration of Rosa Roncales," ¶ 41, ECF No. 50-1 p. 5.)

At the close of the interrogation, Battalion Chief Roberts asked Roncales whether there was anything else that she felt was relevant that they had not already asked about. (Defs.' Mot. Summ. J. Ex. 5D "Transcript of First Interrogation, Part 2," ECF No. 59-17 p. 16.) Roncales stated that she did not think she had any additional information relating to her arrest, but she expressed her concern that "the department ha[d] failed [her] in the confidentiality and handling this with sensitivity." (*Id.* pp. 16–24.) Roncales expressed to District Chief Gerald and Battalion Chief Roberts that her arrest was not public or reported online before she disclosed it to HDOF. (*Id.* pp. 17–18.) After she informed HDOF, she stated that she "[felt] like the whole department quickly knew of specific details" because she "immediately began getting texts from within the department, ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉" (*Id.* p. 17.) "It was not long after that that the media broke the story," ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉ (*Id.* pp. 17–18.)

### b. HDOF's First Conversation with D.C. Metropolitan Police and the February 7, 2017 Interview

After the January 30 interview, Deputy Chief Oughton spoke with Detective Greggory Pemberton with the D.C. Metropolitan Police Department. (Defs.' Mot. Summ. J. Ex. 3 "Affidavit of Alec Oughton," ¶ 15, ECF No. 56-7 p. 5.) During the call, Detective Pemberton informed Deputy Chief Oughton that Roncales's backpack contained two gas masks when she was arrested. (*Id.* ¶ 16, p. 5; Defs.' Mot. Summ. J. Ex. 3E "Oughton Notes of First Call with Pemberton," ECF No. 59-6.) Detective Pemberton also relayed that D.C. Metropolitan Police

13

intended, at that time, to move forward with criminal charges against Roncales. (Defs.' Mot. Summ. J. Ex. 3 "Affidavit of Alec Oughton," ¶ 16, ECF No. 56-7 p. 5; Defs.' Mot. Summ. J. Ex. 3E "Oughton Notes of First Call with Pemberton," ECF No. 59-6.) Detective Pemberton iterated that Roncales's case was not a matter of "wrong place at the wrong time." (Defs.' Mot. Summ. J. Ex. 3 "Affidavit of Alec Oughton," ¶ 16, ECF No. 56-7 p. 5; Defs.' Mot. Summ. J. Ex. 3E "Oughton Notes of First Call with Pemberton," ECF No. 59-6.) Deputy Chief Oughton shared this information with District Chief Gerald and Battalion Chief Roberts, the investigators on Roncales's case, and Gerald and Roberts exchanged emails about questions to "confront" Roncales about Detective Pemberton's information and what their "strategy" was going to be. (Defs.' Mot. Summ. J. Ex. 3 "Affidavit of Alec Oughton," ¶ 17, ECF No. 56-7 p. 5; Roncales Mot. Partial Summ. J. Ex. 22 "Email from Eugene Gerald to Scotty Roberts February 5, 2017," ECF No. 50-15 p. 1–3, 13–19.)

On February 7, 2017, a little over two weeks after Roncales's arrest and one week after her first interview, District Chief Gerald and Battalion Chief Roberts again interviewed Roncales. (Defs.' Mot. Summ. J. Ex. 5I "Transcript of Second Interrogation," ECF No. 59-22.) Roncales received another Inter-Office Memorandum summoning her for questioning with the same Internal Investigation Warning. (Defs.' Mot. Summ. J. Ex. 3G "Inter-Office Memorandum from Alec Oughton to Rosa Roncales February 7, 2017," ECF No. 59-7; Defs.' Mot. Summ. J. Ex. 3H "Second Internal Investigation Warning," ECF No. 59-8.) HDOF did not give Roncales advance notice of the February 7th interview. (Roncales Mot. Partial Summ. J. Ex. 1 "Declaration of Rosa Roncales," ¶ 44, ECF No. 50-1 p. 5.)

During the second interview, District Chief Gerald and Battalion Chief Roberts asked Roncales to make a list of the items in her backpack on the day of the march. (Defs.' Mot.

Summ. J. Ex. 5I "Transcript of Second Interrogation," ECF No. 59-22 p. 4.) Roncales listed the

items "to the best of her memory." (*Id.*) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Defs.' Mot. Summ. J.

Ex. 5L "List of Backpack Contents," ECF No. 59-25.) District Chief Gerald asked Roncales,

"Did you have a gas mask?" to which Roncales responded, "No, sir," ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮ (Defs.' Mot. Summ. J. Ex. 5I "Transcript of Second

Interrogation," ECF No. 59-22 pp. 11–12.) The investigators asked her whether her backpack

had "any sort of identifiers, monograms, nametags, duct tape, anything like that to sort of-," to

which Roncales interjected, "No sir. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" (*Id.* p. 4.) The investigators

inquired, "[w]hat else, if anything, were you wearing that you not either listed . . . or told us

about?" (*Id.* p. 12.) Roncales ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ believed that she

had detailed her outfit "head to toe." (*Id.* pp. 12–13.)



During the interview, Roncales did not add that she had covered the markings and labels

on her backpack and jacket. At her deposition, she explained this omission by saying that she

"wasn't asked about it or [it is] not generally in [the] description when somebody asks what you

were wearing." (Defs.' Mot. Summ. J. Ex. 8 "Deposition of Rosa Roncales," ECF No. 59-27 p.

48.) She also did not mention that the respirators she had with her. At her deposition, she

explained that omission by saying that "[t]hey never asked [her] if she had a respirator."

(Roncales Mot. Partial Summ. J. Ex. 1 "Declaration of Rosa Roncales," ¶ 49, ECF No. 50-1 p. 6.)

c.   **HDOF's Second Conversation with Detective Pemberton**

On March 20, 2017, roughly two months after Roncales's arrest, Deputy Chief Oughton spoke with Detective Pemberton by phone for the second time. (Defs.' Mot. Summ. J. Ex. 3 "Affidavit of Alec Oughton," ¶ 19, ECF No. 56-7 p. 5.) During the call, Detective Pemberton informed him that Roncales "was successfully indicted for felony rioting" on March 9, 2017. (Defs.' Mot. Summ. J. Ex. 3I "Oughton Notes of Second Call with Pemberton," ECF No. 59-9.) Detective Pemberton also told Deputy Chief Oughton about a YouTube video that he believed depicted Roncales "with a female, . . . running and holding hands, . . . carrying short black flags/dowel rods, . . . wearing goggles," and with "black duct tape over logos on her jacket and shoes to keep from being identified." (*Id.*)[11] Detective Pemberton described "'black block' [as] a clothing technique used by this group to limit the ability of law enforcement officials to identify primary actors in crimes." (*Id.*) Detective Pemberton told Deputy Chief Oughton that Roncales was "there" when the front window of a McDonald's was "smashed." (*Id.*)

Ten days later, Deputy Chief Oughton texted Detective Pemberton. (Defs.' Mot. Summ. J. Ex. 3J "Text Messages Between Alec Oughton and Pemberton," ECF No. 59-10.) In the text conversation, Deputy Chief Oughton asked if Roncales had "multiple opportunities to leave while traversing the 16 blocks [of the march]." (*Id.*) Deputy Chief Oughton told Detective

---

[11] Deputy Chief Oughton testified that he took a screenshot of a portion of the YouTube video where Detective Pemberton identified Roncales, but that he could not identify her in the video because "it was difficult to pick [her] out" from the crowd. (Defs.' Mot. Summ. J. Ex. 3 "Affadvit of Alec Oughton," ¶ 25, ECF No. 56-7 p. 6; Defs.' Mot. Summ. J. Ex. 4 "Deposition of Alec Oughton," ECF No. 56-11 p. 31.)

Pemberton that Roncales had "indicated that she did not," but that he did not "think that is true."

(*Id.*)  Detective Pemberton responded:

> That is not true.  I have several witnesses who did leave due to the violence. . . . I also have a dozen officers who testified that they allowed people to leave . . . . So people who wanted to leave were [allowed] to step away.

(*Id.*)  Deputy Chief Oughton responded to Detective Pemberton that he appreciated the input, and

it was "about to make a big difference."  (*Id.*)

### 4.  Deputy Chief Oughton Recommends to Fire Chief McDowell That He Terminate Roncales's Employment

After reviewing the investigation records, Deputy Chief Oughton drafted a memorandum

to Fire Chief McDowell ("Recommendation Memo") concluding that "there were significant

variations between the information provided by FF Roncales and that obtained from Detective

Pemberton





(Defs.' Mot. Summ. J. Ex. 3L "Inter-Office Memorandum from Deputy Chief - Operations to Fire Chief March 30, 2017," ECF No. 59-12 pp. 2–3.)

Deputy Chief Oughton characterized these omissions and inconsistencies as "material" and stated in his "judgment [they] were intended to mislead the investigators and minimize the possibility of disciplinary action." (*Id.* p. 3.) He concluded that Roncales's "incomplete and inconsistent statements" violated the rules stated in the Internal Investigation Warning provided to Roncales before each interview. (*Id.*) Specifically, Deputy Chief Oughton quoted the warning as stating: "[I]f you refuse to testify or to answer fully and truthfully questions relating to your performance of official duties or fitness for duty, you will be subject to charges which could result in your dismissal from the Division of Fire." (*Id.*) Deputy Chief Oughton also noted that Roncales's "behavior represents a violation of Division Directives governing employee conduct, administrative investigations, and employee standards of conduct, truthfulness, and integrity." (*Id.*) For these reasons, Deputy Chief Oughton recommended that Fire Chief McDowell terminate Roncales's "employment with the Division of Fire." (*Id.* p. 4.) Deputy Chief Oughton's memo indicated at the end (by using the abbreviation "PC") that copies be sent to: "District Chief C-Shift, Administrative Investigation File, and Personnel File."[12] (*Id.*) Deputy Chief Oughton emailed his recommendation to Fire Chief McDowell, who responded, "I

---

[12] Defendants state that although Deputy Chief Oughton indicated that a copy of the memo was sent to "Personnel File," he did not place the memo in Roncales's personnel file. (Defs.' Mot. Summ. J. Ex. 3 "Affidavit of Alec Oughton," ¶ 49, ECF No. 56-7 p. 11.)

concur." (Roncales Mot. Partial Summ. J. Ex. 30 "Email from Tony McDowell to Alec Oughton

and Laura Cleveland April 2, 2017," ECF No. 50-17.)

Roncales did not receive the March 30, 2017 memo or have the opportunity to challenge

its conclusions. (Roncales Mot. Partial Summ. J. Ex. 1 "Declaration of Rosa Roncales," ¶ 52,

ECF No. 50-1 p. 6.)

### 5.     Fire Chief McDowell Formally Terminates Roncales's Employment and HDOF Places the Termination Letter in Her Personnel File

On April 4, 2017, approximately three months after her arrest, Fire Chief McDowell met

with Roncales, with Deputy Chief Oughton present to take notes of Roncales's statements.

(Defs.' Mot. Summ. J. Ex. 3M "Oughton Notes of April 4, 2017 Meeting," ECF No. 59-13.)

Roncales states that neither Fire Chief McDowell nor Deputy Chief Oughton informed her in

advance of the purpose of the meeting or that she had any right to review or present evidence,

bring witnesses, or have an attorney. (Roncales Mot. Partial Summ. J. Ex. 1 "Declaration of

Rosa Roncales," ¶ 64, ECF No. 50-1 p. 8.)

During the meeting, Fire Chief McDowell listed for Roncales some of the issues that led

him to believe she had not been truthful. (Defs.' Mot. Summ. J. Ex. 8 "Deposition of Rosa

Roncales," ECF No. 59-27 p. 55.) Among other things, he pointed to Roncales's failure to

inform the investigators that she possessed a gas mask. (*Id*. p. 56.) In response, Roncales

"[a]dmitted that she had a respirator in her backpack that she did not disclose to the

investigators" but "[a]dvised that it was not a gas mask and . . . did not disclose to investigators

because they did not ask about a respirator." (Defs.' Mot. Summ. J. Ex. 3M "Oughton Notes of

April 4, 2017 Meeting," ECF No. 59-13.) Deputy Chief Oughton's notes recount that Roncales

stated that failing to describe the difference between a gas mask and a respirator was "not the

right thing" to do. (*Id*.) Fire Chief McDowell testified that he "took that statement as an

admission to dishonesty." (Defs.' Mot. Summ. J. Ex. 2 "Deposition of Anthony McDowell," ECF No. 56-6 pp. 46–47.) Roncales only recalls saying "something to the effect of in referencing not having a gas mask but [she] did have a respirator, that [she] was being truthful, that maybe it wasn't the smartest thing to do." (Defs.' Mot. Summ. J. Ex. 8 "Deposition of Rosa Roncales," ECF No. 59-27 p. 57.)

███████████████████████████████████████████████████████████

████████████████████████████████ (Defs.' Mot. Summ. J. Ex. 3M "Oughton Notes of April 4, 2017 Meeting," ECF No. 59-13.)[13] At the end of the meeting, Fire Chief McDowell told Roncales she had "made things harder for female firefighters." (Defs.' Mot. Summ. J. Ex. 2 "Deposition of Anthony McDowell," ECF No. 56-6 p. 42.) Fire Chief McDowell then terminated Roncales's employment. (Defs.' Mot. Summ. J. Ex. 1E "Termination Letter," ECF No. 59-1.)

After terminating Roncales from the department, Fire Chief McDowell sent an email to the *entire Fire Division* stating that "[e]ffective immediately, Rosa Roncales is no longer employed by Henrico County." (Defs.' Mot. Summ. J. Ex. 1F "Email from Tony McDowell to FireAll April 4, 2017," ECF No. 59-2.) More than 500 HDOF employees received the email, including employee Donald Deaver. (Roncales Mot. Partial Summ. J. Ex. 36 "Deposition of Donald Deaver," ECF No. 50-19 pp. 5–6.) Deaver stated in his deposition that he was surprised Roncales was terminated and viewed the email as "terrible." (*Id.* p. 9.) The email was placed in Roncales's personnel file. (Defs.' Mot. Summ. J. Ex. 10A "Rosa Roncales Human Resources

---

[13] In her deposition, she stated that she did this to avoid "dox[xing]." (Defs.' Mot. Summ. J. Ex. 8 "Deposition of Rosa Roncales," ECF No. 59-27 p. 16.) "Doxxing" is when individuals use identifiers, such as clothing brand labels, to identify individuals they disagree with, and then publish that person's private information or identity online as a form of punishment or revenge. *See* https://www.merriam-webster.com/dictionary/dox.

Personnel File," ECF No. 59-29 p. 6.) Fire Chief McDowell emailed County Manager John

Vithoulkas, Henrico County Attorney Lee Ann Anderson, and Director of Human Resources

Paula Reid, informing them that:

> [t]his afternoon I terminated the employment of Ms. Rosa Roncales. In my meeting
> with her, she admitted to being dishonest during the investigation, and she also
> made other statements that confirmed she violated the public trust and her oath of
> office. She tarnished the reputation of this organization, and for this I take
> responsibility.

(Defs.' Mot. Summ. J. Ex. 1G "Email from Tony McDowell to John Vithoulkas April 4,

2017," ECF No. 59-3.) Later that day, Fire Chief McDowell forwarded a copy of that

email to Henrico Police Chief Humberto Cardounel and an individual named Doug, or "D

A" Middleton.[14] (Roncales Mot. Partial Summ. J. Ex. 38 "Email from Tony McDowell to

D A Middleton and Humberto Cardounel April 4, 2017," ECF No. 53-18.)

The next day, in an April 5, 2017 letter, Fire Chief McDowell formally notified Roncales

that her employment with HDOF had been terminated (the "Termination Letter"). (Defs.' Mot.

Summ. J. Ex. 1E "Termination Letter," ECF No. 59-1.) In the letter, Fire Chief McDowell stated

that his decision to terminate her employment was "[b]ased on [her] material omissions and

failure to be forthcoming during the investigation." (*Id.* p. 2.) The letter indicated that a copy

would be sent to Human Resources. (*Id.* p. 3.) The letter was filed in Roncales's personnel file.

(Defs.' Mot. Summ. J. Ex. 10A "Rosa Roncales Human Resources Personnel File," ECF No. 59-

29 pp. 3–4.)

---

[14] While neither Roncales nor Defendants have specifically stated the identity of Doug
Middleton, he appears to be Douglas A. Middleton, former Henrico Police Chief and Deputy
County Manager for Public Safety. *See* https://www.nbc12.com/story/31734391/retiring-
henrico-pd-chief-middleton-honored-for-years-of-service/;
https://henrico.us/news/2018/12/henrico-taps-mcdowell-as-deputy-county-manager/.

### 6.   Roncales's Ensuing Search for Employment

After she lost her job, Roncales applied for various kinds of employment. (Roncales Mot. Partial Summ. J. Ex. 1 "Declaration of Rosa Roncales," ¶ 66, ECF No. 50-1 p. 8.)  In each application process, she has answered "No" as to whether prospective employers may contact the HDOF.  (*Id.* ¶ 66, p. 8.)  For instance, in August 2017, Roncales applied for a public safety position with the ██████████████████████████ (*Id.* ¶ 65, p. 8.)  On her application, Roncales denied ████████ permission to contact Henrico County.  (*Id.* ¶ 65, p. 8.) She was not hired for this position. (Roncales Mot. Partial Summ. J. Ex. 39 "████████ FOIA Materials," ECF No. 53-19 p. 10.)

Between July 2017 and March 2020, Roncales applied for ████ positions with ████████████████████████████ (Defs.' Mot. Summ. J. Ex. 8 "Deposition of Rosa Roncales," ECF No. 59-27 pp. 74–75.)  In August 2018, Roncales applied for a part-time EMT/medic job with ██████████████████████ (*Id.* p. 70.)  Roncales does not recall whether she gave ████ permission to contact HDOF regarding her employment there.[15]  (*Id.* p. 72.)  After applying to the ████████████████ and the ████, Roncales did not apply to other public safety positions. (*Id.* pp. 73–74.)  Instead, she obtained a graduate teaching degree in December 2019 and obtained a full-time ██████ position with ██████████ ██████████████ (*Id.* p. 5, 83.)

Only Human Resources employees or the Fire Chief have access to employee personnel files and the authority to release them. (Defs.' Mot. Summ. J. Ex. 3 "Affidavit of Alec Oughton," ¶¶ 43–47, ECF No. 56-7 pp. 9–10.)  The Henrico Human Resources office only releases information in employee personnel files pursuant to a signed authorization from the

---

[15] The record does not show that ████ contacted anyone at HDOF regarding Roncales's employment there.

subject employee. (Defs.' Mot. Summ. J. Ex. 20 "Deposition of Paula Reid," ECF No. 56-22 p. 1.) Paula Reid affirmed that, during her tenure as Human Resources Director, she never received a release signed by a former employee asking Henrico County to release their personnel file to a prospective employer. (*Id.* p. 2.) Deputy Chief Oughton and Fire Chief McDowell also testified that they are not aware of any situation where a release of an entire personnel file has occurred during their respective tenures. (Roncales Mot. Partial Summ. J. Ex. 31 "Deposition of Paula Reid," ECF No. 50-18 p. 5; Defs.' Mot. Summ. J. Ex. 2 "Deposition of Anthony McDowell," ECF No. 56-6 p. 64; Defs.' Mot. Summ. J. Ex. 3 "Affidavit of Alec Oughton," ECF No. 56-7 p. 10.)

Roncales's attorney submitted a Freedom of Information Act ("FOIA") request to the ▮▮▮▮▮▮▮▮▮▮ seeking "[a]ny documents of communications or correspondence, including emails, between any employee of the ▮▮▮▮▮▮▮▮ . . . and Ms. Roncales's former employers, *as part of her application background and employment check*." (Roncales Mot. Partial Summ. J. Ex. 39 "▮▮▮▮▮ FOIA Materials," ECF No. 53-19 p. 3 (emphasis added).) Included in the documents responsive to that request was a copy of Fire Chief McDowell's April 4, 2017 email informing the entire Fire Division that Roncales was "no longer employed by Henrico County." (*Id.* p. 19.) Henrico employee Donald Deaver had forwarded that email to someone named ▮▮▮▮▮▮▮▮, whom Roncales identifies as ▮▮▮▮▮▮▮▮▮ (Roncales Mot. Partial Summ. J. Ex. 35 "Email from Donald Deaver to ▮▮▮▮▮▮ April 4, 2017," ECF No. 53-16; Roncales Mem. in Supp. Mot. Partial Summ. J. ECF No. 50 p. 20.) Additionally, upon signed release, Roncales has received her "personnel information" from HDOF. (Defs.' Mot. Summ. J. Ex. 9 "Correspondence between Lee Ann Anderson and Rachel Cotton Retrieving Roncales's Personnel File," ECF No. 59-28.) Roncales notes that she "still

intend[s] and hope[s] to pursue a career in public safety." (Roncales Mot. Partial Summ. J. Ex. 1 "Declaration of Rosa Roncales," ¶ 68, ECF No. 50-1 p. 9.)

### 7. The Parties Do Not Dispute the Sequence of Events, but Disagree as to Whether Roncales Was Truthful During the Investigation

The dispute in this case centers on Roncales's statements during the January 30, February 7, and April 4 interrogations. Defendants contend that Fire Chief McDowell terminated Roncales's employment "[b]ased on her material omissions and failure to be forthcoming during the investigation." (Defs.' Mot. Summ. J. Ex. 1E "Termination Letter," ECF No. 59-1 p. 1.) Roncales contends that she remained truthful and forthcoming and did not omit material information. (Roncales Mot. Partial Summ. J. Ex. 1 "Declaration of Rosa Roncales," ¶ 41, ECF No. 50-1 p. 5.)

For instance, the parties dispute whether Roncales was truthful when she denied having a "gas mask" with her at the march. (Def. Mem. Supp. Mot. Summ. J. 27, ECF No. 56.) Roncales argues that she originally did not include the respirators among the items she carried in her backpack because she could not recall whether the respirators were in her backpack or Phipps's backpack. (Defs.' Mot. Summ. J. Ex. 8 "Deposition of Rosa Roncales," ECF No. 59-27 p. 56.) She also declares that she truthfully said she did not have a gas mask because she had a respirator, which differs from a "gas mask." (*Id.* p. 57.) Defendants point to Deputy Chief Oughton's note that Roncales had said that "not disclosing the respirator" was "not the right thing," (Defs.' Mot. Summ. J. Ex. 3M "Oughton Notes of April 4, 2017 Meeting," ECF No. 59-13), and argue that such a statement indicates that Roncales admitted she was not forthcoming. (Defs.' Mot. Summ. J. Ex. 2 "Deposition of Anthony McDowell," ECF No. 56-6 pp. 46–47.) Roncales contests Defendants' characterization of her statements and instead recalls saying "something to the effect of in referencing not having a gas mask but [she] did have a respirator,

24

that [she] was being truthful, that maybe it wasn't the smartest thing to do." (Defs.' Mot. Summ. J. Ex. 8 "Deposition of Rosa Roncales," ECF No. 59-27 p. 57.)

Also, the parties disagree as to whether Roncales acted deceitfully in failing to tell investigators that she had covered logos on her clothing. (Def. Mem. Supp. Mot. Summ. J. 27.) Defendants argue that Roncales did not inform the investigators ███████████████████████ ██████████████████████████████████ (*Id.* 27–28.) Roncales contends that she informed the investigators that ████████████████████████████████ ███████████████████████████████████████ was not untruthful in omitting this information. (Defs.' Mot. Summ. J. Ex. 51 "Transcript of Second Interrogation," ECF No. 59-22 p. 10; Defs.' Mot. Summ. J. Ex. 8 "Deposition of Rosa Roncales," ECF No. 59-27 p. 58.)

As discussed in detail below, these disagreements create a genuine dispute of material fact about whether Fire Chief McDowell used the investigation as a pretext to terminate Roncales's employment.

**B.   Procedural Background**

Roncales brings two claims in her Second Amended Complaint. (ECF No. 30.) First, she asserts that Defendants violated her First Amendment rights when they subjected her to adverse treatment and termination "on account of [her] political views and activities accomplished." (Sec. Am. Compl. ¶ 53, ECF No. 30.) Second, she maintains that the County of Henrico and Fire Chief McDowell "intentionally, recklessly and in conscious disregard to [her] Fourteenth Amendment due process rights and liberty interests concocted a pretextual and false finding that [she] had lied, or been untruthful and dishonest" during the Fire Department's investigation into her arrest. (*Id.* ¶ 61.) Roncales contends that "[t]he conduct of [the County of

25

Henrico and Fire Chief McDowell], including their false finding of 'dishonesty,' has caused and will continue to cause [her] scorn from the public at large and by prospective public safety employees in the future, particularly in the fire-fighting community," who will view or learn of the information in her file. (*Id.* ¶ 64.)

Defendants moved to dismiss Roncales's Second Amended Complaint, (ECF No. 31), which the Court granted in part on March 31, 2020. The Court dismissed the County of Henrico as a defendant and the claims against Fire Chief McDowell in his official capacity. Therefore, only Roncales's First Amendment retaliation claim against Defendants in their individual capacities and her Fourteenth Amendment claim against Fire Chief McDowell in his individual capacity remain.

On November 11, 2020, Roncales moved for partial summary judgment, seeking judgment as a matter of law on her Due Process claim against Fire Chief McDowell. Defendants timely responded to the Roncales Partial Motion, and Roncales replied. (ECF Nos. 63, 66.) The Court later allowed each side to file supplemental submissions. (ECF Nos. 86, 87.)[16]

On November 12, 2020, Defendants filed the Motion for Summary Judgment, seeking judgment as a matter of law as to all claims. (ECF No. 55.) Roncales timely responded, and Defendants replied. (ECF Nos. 69, 79.)

---

[16] After moving for summary judgment, Defendants filed a Motion for Supplementary Relief arguing that Roncales served two exhibits after the close of discovery: (1) the Chesterfield County blank application materials, (ECF No. 50-21); and, (2) the City of Richmond blank application materials, (ECF No. 54-3). Defendants argue that Roncales's late disclosure violated Federal Rule of Civil Procedure 26(e) and was neither "substantially justified" nor "harmless." Fed. R. Civ. P. 37(c)(1). The Court noted that the documents were pertinent to Roncales's position, but the surprise was not substantial, Defendants had appropriate time to cure any surprise, and the documents did not disrupt the trial or summary judgment process. (May 3, 2021 Order, ECF No. 85.) The Court allowed the Parties to file supplemental submissions about whether the applications create a genuine dispute of material fact, which have ultimately become moot because of the findings in this Opinion. (ECF Nos. 86, 87.)

The Court turns now to the merits of the pending motions.

## II.  Standard of Review:  Rule 56 Motions for Summary Judgment

Summary judgment under Rule 56 is appropriate only when the Court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *Anderson v. Liberty Lobby*, 477 U.S. 242, 248–50 (1986).

"A fact is material if the existence or non-existence thereof could lead a jury to different resolutions of the case." *Thomas v. FTS USA, LLC*, 193 F. Supp. 3d 623, 628 (E.D. Va. 2016) (citing *Liberty Lobby*, 477 U.S. at 248).  Once a party has properly filed evidence supporting its motion for summary judgment, the nonmoving party may not rest upon mere allegations in the pleadings, but instead must set forth specific facts illustrating genuine issues for trial.  *Celotex Corp.*, 477 U.S. at 322–24.  The parties must present these in the form of exhibits and sworn affidavits.  Fed. R. Civ. P. 56(c).

A court views the evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party.  *Liberty Lobby*, 477 U.S. at 255.  Whether an inference is reasonable must be considered in conjunction with competing inferences to the contrary.  *Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 818 (4th Cir. 1995).  Nonetheless, the nonmoving "party is entitled 'to have the credibility of his [or her] evidence as forecast assumed.'" *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (quoting *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)).

In the end, the non-moving party must do more than present a scintilla of evidence in its favor:

27

> Rather, the non-moving party must present sufficient evidence such that reasonable jurors could find by a preponderance of the evidence for the non-movant, for an apparent dispute is not genuine within contemplation of the summary judgment rule unless the non-movant's version is supported by sufficient evidence to permit a reasonable jury to find the facts in his [or her] favor.

*Sylvia Dev. Corp.*, 48 F.3d at 818 (internal quotations, citations, and alterations omitted). The ultimate inquiry in examining a motion for summary judgment is whether there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmoving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50 (internal citations omitted).

In the end, the question the Court must determine is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

### III. Analysis

Because the parties each seek summary judgment on Count II, the Court begins by evaluating that count, which is Roncales's Due Process claim against Fire Chief McDowell. The Court then assesses Defendants' Motion for Summary Judgment on Count I, Roncales' First Amendment retaliation claim.

Because the Court finds that a genuine dispute of material fact exists on this record as to both counts, it will deny all motions for summary judgment.

**A.     The Court Will Deny Summary Judgment on Count II, the Due Process Claim Against Fire Chief McDowell, Because Genuine Disputes of Material Fact Exist as to Whether Fire Chief McDowell Made the Allegedly <u>Stigmatizing Statements Public and Whether the Statements Were False</u>**

The Court will deny summary judgment on Count II because genuine disputes of material fact underly Roncales's Due Process Claim. Genuine disputes exist about whether Fire Chief McDowell made public allegedly stigmatizing statements about Roncales by emailing those

outside of HDOF the purported reasons for her termination, and whether those purported reasons were false. Qualified immunity cannot shield Fire Chief McDowell from liability because Roncales's due process rights were clearly established at the time of Fire Chief McDowell's alleged misconduct.

Roncales's Due Process Claim arises from the combination of two rights protected by the Fourteenth Amendment: "(1) the liberty to engage in any of the common occupations of life, and (2) the right to due process where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him [or her]." *Sciolino v. City of Newport News*, 480 F.3d 642, 646 (4th Cir. 2007) (internal quotation marks and citations omitted). "There are two components to a claim that a governmental employer violated a former employee's Fourteenth Amendment rights by publicly disclosing the reasons for the employee's discharge." *Cannon v. Village of Bald Head Island*, 891 F.3d 489, 501 (4th Cir. 2018). First, the employee must show that the charges against her: "(1) placed a stigma on [her] reputation; (2) were made public by the employer; (3) were made in conjunction with [her] termination or demotion; and (4) were false."[17] *Sciolino*, 480 F.3d at 646. Second, the employee "must demonstrate that [her] liberty was deprived without due process of law." *Cannon*, 891 F.3d at 501.

To find that Roncales has established her Due Process Claim, the Court must consider (1) whether Roncales shows that she was deprived of a protected liberty interest; and, (2) if so, whether Roncales shows she was deprived of that interest without due process of law. *Id.* at 502.

---

[17] The Court will refer to these four elements as the "Sciolino elements."

      **1.**    **Although Roncales Establishes Two of the *Sciolino* Elements, Genuine Disputes of Material Fact Exist as to Whether the Statements Were Made Public and Are False**

Roncales demonstrates that no genuine dispute of material fact exists about whether Fire Chief McDowell's statements (1) would place a stigma on the employee's reputation and, (2) were made in conjunction with her termination. Nevertheless, genuine disputes of material fact exist about whether Fire Chief McDowell's statements are false and whether they were, or are likely to be, made public.

      **a.**    **The Statements Are Sufficiently Stigmatizing**

The record shows that Fire Chief McDowell made two statements sufficiently stigmatizing to support a Fourteenth Amendment claim. First, in the Termination Letter, Fire Chief McDowell informed Roncales that he had terminated her employment because of her perceived "material omissions and failure to be forthcoming during the investigation." (Defs.' Mot. Summ. J. Ex. 1E "Termination Letter," ECF No. 59-1.) Second, Fire Chief McDowell sent an email to County Manager John Vithoulkas, County Attorney Lee Ann Anderson, and Human Resources Director Paula Reid on April 4, 2017, saying that Roncales was terminated because she "admitted to being dishonest during the investigation," "made other statements that confirmed she violated the public trust and her oath of office," and "tarnished the reputation of this organization." (Roncales Mot. Partial Summ. J. Ex. 37 "Email from Tony McDowell to John Vithoulkas April 4, 2017," ECF No. 53-17.) Fire Chief McDowell then forwarded this email to Henrico Police Chief Humberto Cardounel and Deputy County Manager for Public Safety Douglas A. Middleton. (Roncales Mot. Partial Summ. J. Ex. 38 "Email from Tony McDowell to D A Middleton and Humberto Cardounel April 4, 2017," ECF No. 53-18.)[18]

---

[18] Roncales argues that the email from Fire Chief McDowell to the entire department informing them that "[e]ffective immediately, Rosa Roncales is no longer employed by Henrico

Those statements "imply the existence of serious character defects such as dishonesty or immorality." *Robertson v. Rogers*, 679 F.2d 1090, 1092 (4th Cir. 1982); *Sciolino v. City of Newport News*, 480 F.3d 642, 646 n.2 (4th Cir. 2007); *see also Hall v. City of Newport News*, No. 4:09cv136, 2013 WL 488953, at *3 (E.D. Va. Feb. 6, 2013) (finding that a "charge of 'untruthfulness during an internal investigation'" satisfied the stigma element). Therefore, the statements are sufficiently stigmatizing and no genuine dispute of material fact exists to the first *Sciolino* factor.

**b.  Fire Chief McDowell's Statements Were Made in Conjunction with Roncales's Termination**

No dispute exists that the stigmatizing statements were made in conjunction with Roncales's termination. Fire Chief McDowell's Termination Letter explicitly stated that the decision to terminate Roncales was "*[b]ased on* [her] material omissions and failure to be forthcoming during the investigation." (Defs.' Mot. Summ. J. Ex. 1E "Termination Letter," ECF No. 59-1 (emphasis added).) Likewise, Fire Chief McDowell's emails to the County Manager and Police Chief begin with, "[t]his afternoon I terminated the employment of Ms. Rosa Roncales." (Roncales Mot. Partial Summ. J. Ex. 37 "Email from Tony McDowell to John Vithoulkas April 4, 2017," ECF No. 53-17; Roncales Mot. Partial Summ. J. Ex. 38 "Email from

County" is also stigmatizing. However, under the law, that statement cannot be dubbed stigmatizing because it does not contain the allegations of "serious character defects such as dishonesty or immorality" contained in the Termination Letter and Fire Chief McDowell's external email, and, regardless, is an indisputably true statement—Roncales was terminated on April 4, 2017. (*Robertson v. Rogers*, 679 F.2d 1090, 1092 (4th Cir. 1982); *see also Buxton v. Plant City*, 871 F.2d 1037, 1044–45 (11th Cir. 1989) ("providing a termination notice . . . did not constitute a deprivation of [liberty] because the notice did not contain any reasons for his discharge, much less false or stigmatizing information."); Defs.' Mot. Summ. J. Ex. 10A "Rosa Roncales Human Resources Personnel File," ECF No. 59-29 p. 6; Roncales Mot. Partial Summ. J. Ex. 35 "Email from Donald Deaver to         April 4, 2017," ECF No. 53-16.)
       The finding that the email is not stigmatizing, however, does not render it inadmissible at trial. If the parties dispute whether or not a jury should hear this information as evidence of pretext for Roncales's First Amendment claim, the Court will decide accordingly.

Tony McDowell to D A Middleton and Humberto Cardounel April 4, 2017," ECF No. 53-18.) Defendant McDowell does not dispute that Roncales's termination was centered upon their belief that she was not forthcoming during the HDOF investigation of her arrest. Therefore, Roncales satisfies the third *Sciolino* element in support of her Due Process claim against Fire Chief McDowell.

### c. A Genuine Dispute of Material Fact Exists about Whether the Stigmatizing Statements Were Made Public

Roncales's argument that the statement in her Termination Letter is likely to be made public must fail as a matter of law. However, the record shows a genuine dispute of material fact as to whether Fire Chief McDowell's statement in the emails to Vithoulkas, Anderson, Reid Cardounel, and Middleton constitute publication. Therefore, the Court will deny both parties summary judgment on the second *Sciolino* element. 480 F.3d at 646.

A plaintiff may satisfy the publication element by proving either *actual* dissemination of the charges to prospective employers or a *likelihood* of dissemination of the false charges to potential employers. *Id.* at 646 n.4, 650. Further, publication is not limited only to dissemination through the physical inspection of personnel files and can include more general dissemination of information. *See id.* at 650; *Ledford v. Delancey*, 612 F.2d 883, 887 (4th Cir. 1980) (finding an allegation "that certain false information has been circulated and will continue to be circulated to prospective employers" sufficient to satisfy the publication prong). Any "public announcement of reasons for an employee's discharge" could suffice. *Johnson v. Morris*, 903 F.2d 996, 999 (4th Cir. 1990).

### i) The Termination Letter

Roncales argues that the stigmatizing statements in the Termination Letter are likely to be made public because they remain in her personnel file. It is true that the statement in the letter

32

that Roncales was terminated because of "material omissions and failure to be forthcoming during the investigation" is stigmatizing and that the Termination Letter remains in Roncales's personnel file. (Defs.' Mot. Summ. J. Ex. 1E "Termination Letter," ECF No. 59-1; Defs.' Mot. Summ. J. Ex. 10A "Rosa Roncales Human Resources Personnel File," ECF No. 59-29 pp. 3–4.) However, Roncales does not present strong evidence that potential employers will likely request the personnel file, or that HDOF would release the file absent a signed authorization from Roncales.

A plaintiff can show a likelihood that a personnel file will be made public by alleging that the employer "has a practice of releasing personnel files to all inquiring employers," or that "although his former employer releases personnel files only to certain inquiring employers, [] he [or she] intends to apply to at least one of these employers." *Sciolino v. City of Newport News*, 480 F.3d 642, 650 (4th Cir. 2007). In either case, the plaintiff "must allege that the prospective employer is likely to request the file from [her] former employer." *Id.*

Roncales alleges that, in her experience, public safety employers inquire about why she left past employment, whether they may contact her former employers, and whether she will authorize a release of her information. However, Roncales presents scant evidence about the information or documents that potential employers are likely to request, and whether prospective employers are likely to request personnel files. To the extent she contends potential employers may seek only oral descriptions of what is in the file, she has not established that either. And while she declares she felt unable to allow ▮▮▮▮▮▮ to contact HDOF, that contention does not bring her claim of publication across the line.[19]

---

[19] Roncales admits in her Reply that she lacks this evidence because "subjecting a prospective employer . . . to discovery such as a deposition serves to broadcast and disclose on a significant level the stigmatizing charges against an employee." (ECF No. 66, pp. 18–19.) While the Court is sympathetic, the burden of proof must be met.

Moreover, Paula Reid, the Director of Human Resources for Henrico County, testified that information in Human Resources personnel files would only be released pursuant to a signed authorization from the subject employee. (Defs.' Mot. Summ. J. Ex. 20 "Deposition of Paula Reid," ECF No. 56-22 p. 1.) Director Reid, Deputy Chief Oughton, and Fire Chief McDowell testified that they are not aware of any situation where a release of an entire personnel file has occurred during their respective tenures. (*Id.* p. 2; Defs.' Mot. Summ. J. Ex. 2 "Deposition of Anthony McDowell," ECF No. 56-6 p. 64; Defs.' Mot. Summ. J. Ex. 3 "Affidavit of Alec Oughton," ECF No. 56-7 p. 10.)[20] Therefore, the Termination Letter located in Roncales's personnel file is not likely to be made public.[21]

### ii)    Fire Chief McDowell's Email Relaying the Reasons for Roncales's Termination

The record shows that Fire Chief McDowell disseminated the same allegations contained in the Termination Letter through email, including to individuals that Roncales claims are "not [] HDOF employee[s]." (Roncales Mem. in Supp. Mot. Summ. J., ECF No. 50 p. 19.) Therefore, a

---

[20] The Court need not decide whether publication pursuant to a signed authorization from the employee negates the Fourteenth Amendment claim because Roncales does not present evidence that a potential employer is likely to request her personnel file, the predicate, under Fourth Circuit law, to even require a signed authorization. Most Courts to address this issue hold that "allowing access to records upon receipt of a release signed by the subject of the records does not satisfy the publication requirement for a liberty deprivation." *Buxton v. Plant City*, 871 F.2d 1037, 1044 (11th Cir. 1989); *see also Flood v. Cnty. of Suffolk*, 820 F. Supp. 709, 714 n.10 (E.D.N.Y. 1993) ("[D]isclosures made pursuant to a release . . . are not protected by the Fourteenth Amendment."). However, the Fourth Circuit in *Sciolino* noted that "[t]he likelihood standard requires a plaintiff to allege that the personnel file is available to prospective employers, and that those prospective employers not only have permission to, but are likely to, inspect the file." *Sciolino v. City of Newport News*, 480 F.3d 642, 650 n.5 (4th Cir. 2007).

[21] Roncales also notes that, on two occasions, she has submitted signed releases to Henrico and obtained her personnel file containing the Termination Letter. (Roncales Mot. Partial Summ. J. Ex. 39 "▮▮▮▮▮ FOIA Materials," ECF No. 53-19.) This does not constitute publication because employees have a right to their own personnel information.

reasonable jury could find that "certain false information has been circulated" and therefore may "continue to be circulated to prospective employers." *Ledford*, 612 F.2d at 887. Fire Chief McDowell's email to County Manager John Vithoulkas, Senior Assistant County Attorney Lee Ann Anderson, and Human Resources Director Paula Reid, later forwarded to Henrico Police Chief Humberto Cardounel and Deputy County Manager for Public Safety Douglas A. Middleton, contained the stigmatizing statements that Roncales "admitted to being dishonest during the investigation," "made other statements that confirmed she violated the public trust and her oath of office," and "tarnished the reputation of this organization." (Roncales Mot. Partial Summ. J. Ex. 37 "Email from Tony McDowell to John Vithoulkas April 4, 2017," ECF No. 53-17; Roncales Mot. Partial Summ. J. Ex. 38 "Email from Tony McDowell to D A Middleton and Humberto Cardounel April 4, 2017," ECF No. 53-18.) If Roncales could prove at trial that at least one of these individuals, (1) was not considered an HDOF employee, and (2) is a prospective employer[22] or has connections with prospective employers, a reasonable jury could conclude that Fire Chief McDowell's statements were therefore "circulated" or will "continue to be circulated" among "prospective employers."[23] Yet, a reasonable jury could also find that Fire

---

[22] Roncales notes that she "still intend[s] and hope[s] to pursue a career in public safety." (Roncales Mot. Partial Summ. J. Ex. 1 "Declaration of Rosa Roncales," ¶ 68, ECF No. 50-1 p. 9.) Viewing inferences in favor of Roncales, a reasonable juror could conclude that a public safety career could include jobs with police departments, or any other department within Henrico County that the County Manager for Public Safety oversees.

[23] As to "circulation," the Court recognizes the email from Donald Deaver to █████ █████ ended up in Roncales's job application file in █████ (Roncales Mot. Partial Summ. J. Ex. 35 "Email from Donald Deaver to █████ April 4, 2017," ECF No. 53-16; Roncales Mot. Partial Summ. J. Ex. 39 "█████ FOIA Materials," ECF No. 53-19 p. 19.) This email is not stigmatizing because Deaver forwarded Fire Chief McDowell's email to the entire department informing them of Roncales's termination. *See* Footnote 18. It was also "publicized" by Deaver, not Defendants.

However, the email helps establish the genuine dispute of material fact over publication in this case because a reasonable jury could find that it indicates at least some "circulation"

Chief McDowell emailing the statements to the recipients was a discrete event not likely to cause the statements to "continue to be circulated to prospective employers." Therefore, because there are unresolved factual questions as to the publication of stigmatizing information, the Court will deny both parties' Motions for Summary Judgment as to Count II.

#### d. Genuine Disputes of Material Fact Exist about Whether Fire Chief McDowell's Statements Are False

Genuine disputes of material fact exist about whether Fire Chief McDowell's statements are false. To meet the final *Sciolino* element, a plaintiff "need only show, in addition to the remaining elements of his [or her] liberty interest claim, that the allegations against him [or her] are capable of being proven false and that he [or she] claims they are false." *Osborne v. King*, No. 2:02cv1250, 2007 WL 3229144, at *6–8 (S.D. W. Va. Oct. 31, 2007). Roncales both claims that Fire Chief McDowell's statements were false, and she also establishes genuine disputes about whether the claims are, in fact, false.

The stigmatizing statements by Fire Chief McDowell that a reasonable jury could find was, or is likely to be, made public is that Roncales "admitted to being dishonest during the investigation," "made other statements that confirmed she violated the public trust and her oath of office," and "tarnished the reputation of this organization." (Roncales Mot. Partial Summ. J. Ex. 37 "Email from Tony McDowell to John Vithoulkas April 4, 2017," ECF No. 53-17; Roncales Mot. Partial Summ. J. Ex. 38 "Email from Tony McDowell to D A Middleton and Humberto Cardounel April 4, 2017," ECF No. 53-18.)

Defendant McDowell's statement that Roncales "admitted to being dishonest during the investigation" stems from a disagreement between Fire Chief McDowell and Roncales about a

---

among public safety departments about information regarding prior employees, and that departments may formally "file" information they receive to use against future job candidates.

comment Roncales made in the April 4, 2017 meeting when she was terminated. Deputy Chief Oughton recorded during the meeting that Roncales said that not discussing the respirator was "not the right thing." (Defs.' Mot. Summ. J. Ex. 3M "Oughton Notes of April 4, 2017 Meeting," ECF No. 59-13.) Defendant McDowell testified that he took this as "an admission to dishonesty." (Defs.' Mot. Summ. J. Ex. 2 "Deposition of Anthony McDowell," ECF No. 56-6 pp. 46–47.) Roncales, however, remembers making a different statement, and one that she did not consider an admission of guilt. She testified that she remembers saying "something to the effect of in referencing not having a gas mask but [she] did have a respirator, that [she] was being truthful, that maybe it wasn't the smartest thing to do." (Defs.' Mot. Summ. J. Ex. 8 "Deposition of Rosa Roncales," ECF No. 59-27 p. 57.) A reasonable jury could accept either party's explanation of this statement and therefore conclude that Roncales did not admit to being dishonest during the investigation and so Defendant McDowell's statement that she "admitted to being dishonest" is false.

Whether Roncales "made other statements that confirmed she violated the public trust and her oath of office" goes to the heart of the dispute in this case—whether Roncales was untruthful, deceptive, and not forthcoming during the investigation. If Roncales can prove at trial her claim that she answered all interrogation questions "truthfully and to the best of [her] memory," a reasonable jury could find that the statements that "she violated the public trust and her oath of office" and "tarnished the reputation of this organization" are false. (Roncales Mot. Partial Summ. J. Ex. 1 "Declaration of Rosa Roncales," ¶ 41, ECF No. 50-1 p. 5.) Likewise, if Defendant McDowell can prove at trial his claims that Roncales was terminated because of her "material omissions and failure to be forthcoming during the investigation," a reasonable jury could find that the statements that Roncales "violated the public trust and her oath of office" and

37

"tarnished the reputation of this organization" are not false.  (Def's Mem. Opp. Pl. Mot. Partial Summ. J. 19, ECF No. 63.)

The parties have several factual disputes regarding Roncales's candor during the investigation.  Primarily, the parties dispute whether "[d]uring the investigation, Roncales withheld the fact that she had a gas mask in her backpack, that she covered markings on her backpack and clothes, and covered her face with a scarf."  (Def's Mem. Opp. Pl. Mot. Partial Summ. J. 13, ECF No. 63.)

### i)      The "Gas Mask" or "Respirator"

Defendant McDowell and Roncales dispute whether Roncales lied during the interrogation by not disclosing that she had a "gas mask" or "respirator" on her person during the march.[24]  During the second interview, District Chief Gerald and Battalion Chief Roberts asked Roncales to make a list of the items in her backpack on the day of the march.  (Defs.' Mot. Summ. J. Ex. 5I "Transcript of Second Interrogation," ECF No. 59-22 p. 4.) ███████████

███████████████████████████████████████████████████████████

███████ (Defs.' Mot. Summ. J. Ex. 5L "List of Backpack Contents," ECF No. 59-25.)  Based on information from Detective Pemberton that Roncales's backpack contained two "gas masks" when she was arrested, District Chief Gerald asked Roncales, "Did you have a gas mask?" (Defs.' Mot. Summ. J. Ex. 3E "Oughton Notes of First Call with Pemberton," ECF No. 59-6; Defs.' Mot. Summ. J. Ex. 5I "Transcript of Second Interrogation," ECF No. 59-22 pp. 11–12).

---

[24] Without making a finding of fact, the Court will refer to this object as a "respirator." While Defense does not agree that a difference between a gas mask and a respirator exists, they will have the opportunity to argue that point at trial.  The Court notes that the Centers for Disease Control Certified Equipment List that Roncales submitted describes this item as a "respirator." Pl. Repl. Supp. Partial Summ. J. Ex. 48 "Centers for Disease Control Certified Equipment List," ECF No. 66-4.

Roncales responded, "No, sir." (Defs.' Mot. Summ. J. Ex. 5I "Transcript of Second Interrogation," ECF No. 59-22 pp. 11–12.

Defendant McDowell argues that "it remains undisputed that [Roncales] was not forthcoming to investigators Gerald or Roberts because she never mentioned the gas mask when questioned about it" and "failed to list a gas mask (or even a 'respirator') on the inventory of her backpack." (Def's Mem. Opp. Pl. Mot. Partial Summ. J. ¶¶ 33, 73, ECF No. 63 pp. 4, 7.) Roncales argues that "[w]hat the evidence showed was that even when she did not tell investigators that she had two respirators, she had no intent to deceive [because] (1) a respirator is not a gas mask and (2) she did not recall whether the respirators were in her back pack or that of her partner." (Pl. Opp. Defs.' Mot. Summ. J., ECF No. 67 p. 7.) Roncales asserts that a "respirator and a gas mask are not the same thing" because "a gas mask covers an individual's head and face, whereas a respirator covers the mouth and nose." (Roncales Mot. Partial Summ. J. Ex. 1 "Declaration of Rosa Roncales," ¶ 24, ECF No. 50-1 p. 3.) Roncales declares that she knows this difference "through [her] public safety training" and maintains that she has "never owned a gas mask," nor did she have one with her in Washington, D.C. "at any time." (*Id.* ¶¶ 23–24, p. 3.) Roncales states that, "[t]o this day, I do not remember if Phipps and I packed the respirators in my backpack or her['s]." (*Id.* ¶ 22, p. 3.)

A reasonable jury could conclude that a respirator is not a gas mask and therefore the allegation that Roncales lied about possessing a gas mask was false. Alternatively, a reasonable jury could reject her contentions. This creates a genuine dispute of material fact as to whether Roncales was forthcoming during this portion of the investigation.

### ii)    Covering Logos with Duct Tape

Next, the parties dispute whether Roncales was forthcoming about covering brand logos on her clothing and backpack with duct tape. Deputy Chief Oughton received information from Detective Pemberton that Roncales placed "black duct tape over logos on her jacket and shoes to keep from being identified" and "limit the ability of law enforcement officials to identify primary actors in crimes." (Defs.' Mot. Summ. J. Ex. 3I "Oughton Notes of Second Call with Pemberton," ECF No. 59-9.) ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉



(Defs.' Mot. Summ. J. Ex. 5I "Transcript of Second Interrogation," ECF No. 59-22 p. 4.)

Defendant McDowell argues that "Roncales withheld the fact that . . . she covered markings on her backpack and clothes" even though she was "given multiple opportunities to amplify her answers." (Def's Mem. Opp. Pl. Mot. Partial Summ. J. 8, 12 ECF No. 63 pp. 9, 13.) Roncales counters that "[i]t is not readily apparent that a question about what you are wearing would include covering brand logos." (Pl. Opp. Defs.' Mot. Summ. J. 10, ECF No. 67 p. 10.) A reasonable jury could find that Roncales's lack of response to a question about "duct tape" when she had duct tape on her person covering "identifiers" was deceitful. The Court concludes that a reasonable jury could find for either party.

40

### iii) The Scarf

Lastly, Defendant McDowell and Roncales dispute whether Roncales's failure to mention

she was wearing a scarf during the march was a material omission. In the first interrogation,

Battalion Chief Roberts and Roncales had the following exchange about her clothing:



(Defs.' Mot. Summ. J. Ex. 5D "Transcript of First Interrogation, Part 2," ECF No. 59-17 p. 6.)

In the second interrogation,



(Defs.' Mot. Summ. J. Ex. 5I "Transcript of Second Interrogation," ECF No. 59-22 pp. 12–13.)

Defendant McDowell repeatedly points out that in the exchanges about clothing,

"Roncales did not inform the investigators she was wearing a scarf." (Def's Mem. Opp. Pl. Mot.

Partial Summ. J. ¶ 76, ECF No. 63 p. 9.) He insinuates that this information was material to the

investigation because she "intermittently cover[ed] her face" with it during the march. (Defs.'

Reply Supp. Mot. Summ. J. 15, ECF No. 79.)

41

Roncales states that it "was a simple scarf which Rosa told them was in her backpack." (Pl. Opp. Defs.' Mot. Summ. J. ¶ 47, ECF No. 67 p. 4.)[25]  Roncales also claims that "Defendant McDowell acknowledged that only material misrepresentations should have been considered in the investigation.  However, both he and Defendant Oughton had difficulty describing how the so-called omissions were material to their investigation." (*Id.* ¶ 79, p. 5 (internal citations omitted).)

Therefore, Roncales presents sufficient evidence for a finder of fact to reasonably conclude that she did not "violate[] the public trust and her oath of office" and "tarnish[] the reputation of this organization" through her conduct during the interrogations.  However, the same finder of fact could also reasonably conclude that Roncales purposefully "withheld" this information and because of that Defendant McDowell's statement was not false.  Because the Parties dispute underlying facts and that dispute is material, summary judgment is inappropriate as to Count II.

> **2.   The Court Will Not Grant Fire Chief McDowell Qualified Immunity Because Roncales's Rights Were Clearly Established When Fire Chief McDowell Terminated Her From the Henrico County Division of Fire**

Qualified immunity cannot shield Fire Chief McDowell from liability because Roncales's rights were clearly established at the time of his actions.  For a right to be clearly established, there need not be "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Cannon*, 891 F.3d at 497.  Case law has long recognized the right to a pre-termination hearing prior to termination of public employment in circumstances in which the termination could amount to the deprivation of a protected property

---

[25] In fact, the exhibit Defendants submitted of the list Roncales made during the second interrogation of the contents in her backpack included "clothing (hat/scarf)." (Defs.' Mot. Summ. J. Ex. 5L "List of Backpack Contents," ECF No. 59-25.)

or liberty interest. *See, e.g., Fields v. Durham*, 909 F.2d 94, 97 (4th Cir. 1990) (noting that the Supreme Court has emphasized "that the Due Process Clause normally requires a hearing before the State deprives a person of liberty or property"); *Johnson v. Morris*, 903 F.2d 996, 999 (4th Cir. 1990) (accord).

The parties do not contest that Fire Chief McDowell failed to provide Roncales with a pre-termination hearing. And because Roncales presents evidence sufficient for a jury to reasonably find that Fire Chief McDowell's statements deprived her of a liberty interest, any such deprivation therefore occurred "without due process of law." *Cannon*, 891 F.3d at 505. Because Roncales's right to a pre-termination hearing was clearly established at the time of his actions, Fire Chief McDowell is not entitled to qualified immunity on Roncales's due process claim.

**B.      The Court Will Deny Summary Judgment on Count I, the First Amendment Retaliation Claim, Because A Genuine Dispute of Material Fact Exists as to Whether Roncales was Terminated Because of Protected Speech**

Only Defendants have moved for summary judgment on Roncales's First Amendment retaliation claim. The Court must therefore decide, while viewing the evidence in a light most favorable to Roncales, whether a reasonable jury could conclude that Fire Chief McDowell's stated reasons for terminating Roncales's employment were pretextual, and whether he was instead substantially motivated by Roncales's protected speech. For the reasons stated below, the Court concludes that genuine disputes of material fact preclude summary judgment on Count I.

**1.      Legal Standard**

"[A] First Amendment retaliation claim under § 1983 consists of three elements: (1) the plaintiff engaged in constitutionally protected First Amendment activity, (2) the defendant took

an action that adversely affected that protected activity, and (3) there was a causal relationship between the plaintiff's protected activity and the defendant's conduct." *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 537 (4th Cir. 2017); *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000) (accord).

Regarding public employees, "[t]he First Amendment protects not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) (internal quotations and citations omitted). Therefore, "[t]he First Amendment protects public employees from termination of their employment in retaliation for their exercise of speech on matters of public concern." *McVey v. Stacy*, 157 F.3d 271, 277 (4th Cir. 1998). Retaliation is also not limited to termination. A government employer takes a sufficiently retaliatory action against an employee when the employer makes decisions that relate to the employee's "promotion, transfer, recall, and hiring" based on the employee's exercise of his or her First Amendment rights as long as the act is "more than *de minimis* or trivial." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000).

Public employees' right of expression is not without limits. The government retains an interest in "effectiveness, efficiency, order, and the avoidance of disruption" and therefore "has an interest in regulating the speech of its employees." *Id.* (citing *Connick v. Myers*, 461 U.S. 138, 145 (1983)). In weighing a public employee's right to speak on a matter of concern against the government's interest in promoting efficient administration, courts in the United States Court of Appeals for the Fourth Circuit apply a three-part test (the "*McVey* test"), determining:

> (1) whether the public employee was speaking as a citizen upon a matter of public concern or as an employee about a matter of personal interest; (2) whether the employee's interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public; and

44

(3) whether the employee's speech was a substantial factor in the employee's [adverse employment] decision.

*Adams*, 640 F.3d at 560–61 (quoting *McVey*, 157 F.3d at 277–78).

As to the first *McVey* factor, that the public employee was "speaking as a citizen on a matter of public concern," a litigant may not advance a First Amendment retaliation cause of action concerning a matter of mere personal interest. *Id.* at 560 (quoting *McVey*, 157 F.3d at 277). For a First Amendment retaliation claim, "whether the speech addressed a matter of public concern, is 'the threshold question.'" *Brooks v. Arthur*, 685 F.3d 367, 371 (4th Cir. 2012) (quoting *Rankin v. McPherson*, 483 U.S. 378, 384 (1987)). "Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community." *Kirby v. City of Elizabeth City, N.C.*, 388 F.3d 440, 446 (4th Cir. 2004) (citation omitted). In determining whether an employee's speech or activity addresses a matter of public concern, the court must consider "the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48.

With respect to the second *McVey* factor, "whether the employee's interest in speaking . . . outweighed the government's interest in providing effective and efficient services to the public," *Adams*, 640 F.3d at 560–61 (quoting *McVey*, 157 F.3d at 277–78), courts must review this fact-specific inquiry in light of the actors involved and their relationships. *The Balt. Sun Co. v. Ehrlich*, 437 F.3d 410, 416 (4th Cir. 2006). In weighing this factor courts must consider the "employee's role in the government agency, and the extent to which it disrupts the operation and mission of the agency."[27] *McVey*, 157 F.3d at 278 (citation omitted). An

---

[27] The *McVey* Court identifies nine factors relevant to this inquiry, including:

whether the employee's speech (1) impairs discipline by superiors; (2) impairs harmony among co-workers; (3) has a detrimental impact on close working relationships; (4) impedes the performance of the public employee's duties;

45

employee "who has a confidential, policymaking, or public contact role and speaks out in a manner that interferes with or undermines the operation of the agency, its mission, or its public confidence, enjoys substantially less First Amendment protection than does a lower level employee." *Id.*

As to the third element, "whether the employee's speech was a substantial factor in the employee's [adverse employment] decision," *Adams*, 640 F.3d at 561 (quoting *McVey*, 157 F.3d at 277–78), a plaintiff must show a causal connection between the First Amendment activity and the alleged adverse action. *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005). "In order to establish this causal connection, a plaintiff in a retaliation case must show, at the very least, that the defendant was aware of [his or] her engaging in protected activity." *Id.* (citation omitted). However, "[k]nowledge alone . . . does not establish a causal connection between the protected activity and the adverse action." *Id.* (quotation marks omitted). "There must also be some degree of temporal proximity to suggest a causal connection." *Id.*

The Fourth Circuit recently articulated a two-step process for analyzing the requisite "but for" causation necessary to satisfy the causation prong of the *McVey* test.

> The plaintiff bears the initial burden of proving that his [or her] exercise of his [or her] First Amendment rights was a substantial or motivating factor in the employer's [adverse employment] decision. . . . And if the plaintiff satisfies that burden, the defendant will avoid liability if he [or she] can demonstrate, by a preponderance of the evidence, that he [or she] would have made the same employment decision absent the protected expression.

---

(5) interferes with the operation of the agency; (6) undermines the mission of the agency; (7) is communicated to the public or to co-workers in private; (8) conflicts with the responsibilities of the employee within the agency; and (9) makes use of the authority and public accountability the employee's role entails.

*McVey*, 157 F.3d at 278 (internal quotations and citation omitted).

46

*Penley v. McDowell Cnty. Bd. of Educ.*, 876 F.3d 646, 654 (4th Cir. 2017). "[W]here causal

facts are in dispute, giving rise to a genuine issue of material fact, summary judgment is not

appropriate." *Id.* at 654–55.

> ### 2. A Reasonable Jury Could Find That Roncales's Speech Was a Substantial Factor in Her Termination

Defendants do not argue in their motion for summary judgment that Roncales was not

speaking as a citizen on a matter of public concern, or that her interest in speaking did not

outweigh the government's interest in providing effective and efficient services to the public.

Therefore, the dispute in this case is cabined to the third *McVey* element, the "causation

element."

To prevail on a First Amendment retaliation claim, Roncales must show a causal

connection between her First Amendment activity and the alleged adverse action. *Constantine*,

411 F.3d at 501. "There must also be some degree of temporal proximity to suggest a causal

connection." *Id.* A plaintiff cannot carry this burden if the record undeniably shows that the

adverse actions were based on reasons unrelated to his or her protected speech. *Goldstein*, 218

F.3d at 356. Courts must consider "explanations legitimizing otherwise prohibited conduct"

closely, as such explanations "can easily be conjured *post hoc*." *Id.* at 357. Therefore, when

defendants present a legitimizing explanation, the Court must consider "whether any reasonable

jury could conclude that the articulated reasons for [the adverse action] were a pretext for

[termination] substantially motivated by [plaintiff's] protected speech." *Id.*

> ### a. A Genuine Dispute of Material Fact Exists as to Whether Fire Chief McDowell Terminated Roncales for Her Protected Speech or Some Other Legitimate Reason

Because "causal facts are in dispute," Fire Chief McDowell is not entitled to summary

judgment. *Penley*, 876 F.3d at 654. Defendants argue that Fire Chief McDowell terminated

Roncales for "her own failure to be forthcoming during the [HDOF] investigation," pointing to two discrepancies in Roncales's testimony during the HDOF investigation: whether she had a gas mask in her backpack and whether she covered identifiable markings on her clothing. (Mem. Supp. Def. Mot. Summ. J. 18, ECF No. 56.)

As an initial matter, the parties disagree about the meaning of Roncales's statement in the April 4, 2017 meeting, as Deputy Chief Oughton recorded it, that "not discussing the respirator" was "not the right thing." (Defs.' Mot. Summ. J. Ex. 3M "Oughton Notes of April 4, 2017 Meeting," ECF No. 59-13.) Fire Chief McDowell testified that he interpreted Roncales's statement as "an admission to dishonesty." (Defs.' Mot. Summ. J. Ex. 2 "Deposition of Anthony McDowell," ECF No. 56-6 pp. 46–47.) Roncales, however, remembers making a different statement, and one that she did not consider an admission of guilt. Instead, she testified that she remembers saying "something to the effect of in referencing not having a gas mask but [she] did have a respirator, that [she] was being truthful, that maybe it wasn't the smartest thing to do." (Defs.' Mot. Summ. J. Ex. 8 "Deposition of Rosa Roncales," ECF No. 59-27 p. 57.) A reasonable jury could accept Roncales's version of her statements as true, so that she was not untruthful or deceptive during the investigation.

Beyond the factual question of whether Roncales was forthcoming during the investigation, other evidence in the record could allow a reasonable jury to conclude that Fire Chief McDowell's stated reason for terminating Roncales was a pretext for termination "substantially motivated by [Roncales's] protected speech." *Goldstein*, 218 F.3d at 357. Fire Chief McDowell had been informed that HDOF was being "decimated" by "ugly" comments on its public Facebook page concerning Roncales. (Roncales Mot. Partial Summ. J. Ex. 17 "Email from Taylor Goodman to Tony McDowell and Alec Oughton January 29, 2017," ECF No. 50-

13.)  At the beginning of HDOF's investigation of Roncales, Fire Chief McDowell allegedly

directed District Chief Gerald and Battalion Chief Roberts to question Roncales and "hear that

shit and nip it in the bud." (Defs.' Mot. Summ. J. Ex. 5B "Transcript of First Interrogation, Part

1," ECF No. 59-15 p. 9.)  Prior to the investigation, Fire Chief McDowell emailed HR Director

Reid with his prediction that Roncales would "tell [them] that she was in the vicinity, part of a

crowd, but not personally involved in any acts of violence." (Defs.' Mot. Summ. J. Ex. 1-D

"Email from Paula Reid to Tony McDowell January 27, 2017," ECF No. 56-5.)  While that

comment does not necessarily suggest pretext, he followed that comment by saying that he "did

not plan to impose any discipline until we can prove (*or she admits*) to breaking a law or

violating one of [HDOF's] policies/procedures." (*Id.*)  Based on this evidence, a reasonable jury

could conclude that Fire Chief McDowell had decided before the investigation even began that

the process would end in disciplinary action because he was displeased with her participation in

the march.

Additionally, even before the march and Roncales's arrest, Fire Chief McDowell was

aware of controversy in the department regarding Roncales's political speech on her personal

Facebook page.  According to Roncales, "two members of [Fire Chief McDowell's] chain of

command" "verbally reprimand[ed]" her for a Facebook post concerning "fascism" in America.

(Defs.' Mot. Summ. J. Ex. 8 "Deposition of Rosa Roncales," ECF No. 59-27 pp. 8–14.)  Fire

Chief McDowell stated in his deposition that he was aware of the post and aware that fire

department personnel disagreed with it:

> Q:  Do you know whether or not anybody else in the fire department saw that
> graphic other than Mr. Owens and Mr. Thomas?
> A:  Well, I can only assume that people did, and I will tell you that at this point I'd
> heard discussion about it prior to Ms. Roncales' arrest, but I didn't pay much
> attention to the discussion about what the firefighter had posted.
> Q:  Do you recall what you heard?  You can paraphrase it if you can.

> A: Sure. I heard that Ms. Roncales had posted something on her Facebook page that had a swastika and talked about fascism in the United States, and that it was something that people in the division disagreed with.

(Pl. Opp. Defs.' Mot. Summ. J. Ex. 6 "Deposition of Anthony McDowell," ECF No. 74-4 p. 4.)

The record also shows that Robert Owens, one of the individuals who "reprimanded" Roncales, did not actually look at the Facebook post itself, but only the graphic, and that the person who brought the graphic to him was "upset about it":

> Q: Did you think that other than this question of whether or not the graphic was inappropriate, which would be decided at the County level, did you think that the posting of this graphic would create any problems for Ms. Roncales in the fire department and with her fellow firefighters?
> A: No.
> Q: You did not think so?
> A: No, I did not.
> Q: But you did know that the person who brought it to you was upset about it?
> A: Correct.

(Pl. Opp. Defs.' Mot. Summ. J. Ex. 3 "Deposition of Robert Owens," ECF No. 74-2 p. 2.)

Owens also described the policy as very broad, even "all-encompassing":

> A: . . . [T]hat was what my capacity was, was to find out, you know, essentially, what was going on with that and to fact-find and support her direct supervisor, who was my co-lieutenant at Station 13.
> Q: Did you ever look at the Facebook post itself rather than just the graphic?
> A: No, I did not.
> Q: Why do you think that it might be inappropriate?
> A: As I said before, the way the policy is written, it's a very all-encompassing policy whereas, essentially, anything that is interpreted as offensive or inappropriate by the County could be a violation of the policy. And so it's such an umbrella policy that anything could be deemed inappropriate so that's why.

(*Id.*)

Finally, Defendants' argument that Fire Chief McDowell cannot be held liable for First Amendment retaliation because he did not direct the investigation and merely fired Roncales does not comport with Fourth Circuit precedent. The scope of retaliation is broad, and Roncales need only allege that Fire Chief McDowell "*took some action* that adversely affected her First

Amendment rights." *Constantine*, 411 F.3d at 499 (emphasis added). Fire Chief McDowell weighed Roncales's protected speech along with the determinations from the investigation and decided to terminate her employment. Therefore, Roncales presents sufficient evidence to show that Fire Chief McDowell "took some action" that adversely affected her First Amendment rights. *Id.*

Because genuine disputes of material fact exist about whether Fire Chief McDowell terminated Roncales's employment because she engaged in protected speech, summary judgment on the First Amendment retaliation claim against Fire Chief McDowell is inappropriate.

>    **b.    A Genuine Dispute of Material Fact Exists about Whether
>           Deputy Chief Oughton Took Some Action That Adversely
>           Affected Roncales's First Amendment Rights**

A reasonable jury could find that Deputy Chief Oughton took some action that adversely affected Roncales's First Amendment rights. *See Constantine*, 411 F.3d at 499 ("A plaintiff seeking to recover for First Amendment retaliation must allege that . . . the defendants took some action that adversely affected her First Amendment rights . . . ."); *Goldstein*, 218 F.3d at 352 ("[T]he employee must establish retaliation of some kind—that he was deprived of a valuable government benefit or adversely affected in a manner that, at the very least, would tend to chill his exercise of First Amendment rights.").

Roncales presents sufficient evidence for a reasonable jury to conclude that Deputy Chief Oughton "took some action" with regard to her employment. Deputy Chief Oughton oversaw HDOF's investigation of Roncales. He took evidence from District Chief Gerald and Battalion Chief Roberts and compared Roncales's testimony with his conversations with Detective Pemberton. From this, Deputy Chief Oughton drafted the Recommendation Memo, in which he detailed what he saw as inconsistencies between Roncales's testimony and the description of the events as described by Detective Pemberton. (Defs.' Mot. Summ. J. Ex. 3L "Inter-Office

Memorandum from Deputy Chief - Operations to Fire Chief March 30, 2017," ECF No. 59-12 pp. 2–3.)  Deputy Chief Oughton determined that these alleged misrepresentations violated HDOF policy and recommended terminating Roncales's employment to Fire Chief McDowell.

Roncales further presents evidence that a reasonable jury could conclude Deputy Chief Oughton's actions, like those of Fire Chief McDowell, were substantially motivated by her protected speech as opposed to the supposed admissions in her testimony.  Like Fire Chief McDowell, Deputy Chief Oughton was aware that HDOF was being "decimated" by "ugly" comments on its public Facebook page. (Roncales Mot. Partial Summ. J. Ex. 17 "Email from Taylor Goodman to Tony McDowell and Alec Oughton January 29, 2017," ECF No. 50-13.) The record also shows that, like Fire Chief McDowell, Deputy Chief Oughton was aware of Roncales's controversial Facebook post before she was terminated. (Defs.' Mot. Summ. J. Ex. 4 "Deposition of Alec Oughton," ECF No. 56-11.)[28]

A reasonable jury could also take Deputy Chief Oughton's heavy reliance on Detective Pemberton's assistance at a very early stage of Roncales's criminal charges, without revealing the D.C. Police Department as the source so she could have an opportunity to respond, as evidence of pretext.  Deputy Chief Oughton communicated with Detective Pemberton several times throughout the investigation to discuss potential inconsistencies in Roncales's testimony. Without independently verifying the accuracy of information during Detective Pemberton's ongoing investigation,[29] waiting for Roncales's criminal case to be resolved, or giving Roncales

---

[28] Additionally, a reasonable jury could make a finding that Roncales lacked due process throughout the investigation.  For example, Defendants do not contest that they did not provide Roncales a pre-termination hearing.  Such a denial might indicate pretext.

[29] Detective Pemberton's information seems, on review, inaccurate.  The Superior Court of the District of Columbia not only dropped the charges against Roncales, but entered an Order of Actual Innocence. (Roncales Mot. Partial Summ. J. Ex. 10 "Order to Seal Criminal Records on Grounds of Actual Innocence," ECF No. 50-6.)

an opportunity to confront Pemberton's allegations, Deputy Chief Oughton used Detective

Pemberton's information to "make a big difference." (Defs.' Mot. Summ. J. Ex. 3J "Text

Messages Between Alec Oughton and Pemberton," ECF No. 59-10 p. 4.)

As such, Roncales presents evidence from which a reasonable jury may find that action

was motivated by protected speech.

> **c.  A Genuine Dispute of Material Fact Exists about Whether District Chief Gerald and Battalion Chief Roberts Took Some Action That Adversely Affected Roncales's First Amendment Rights**

A reasonable jury could find that District Chief Gerald and Battalion Chief Roberts took

some action that adversely affected Roncales's First Amendment rights.  Roncales offers

substantial evidence as to their involvement with the investigation as its front line interrogators

and those making the recommendations to Deputy Chief Oughton.  The record shows several

email exchanges between District Chief Gerald, Battalion Chief Roberts, and Deputy Chief

Oughton, discussing "strategy" and "confronting" Roncales.  (Roncales Mot. Partial Summ. J.

Ex. 22 "Email from Eugene Gerald to Scotty Roberts February 5, 2017," ECF No. 50-15 pp. 1–3,

13–19.)  District Chief Gerald commented to Battalion Chief Roberts during the investigation

that it would "get sticky if she [doesn't] come clean," from which a reasonable jury could

conclude their motivation to terminate Roncales from the beginning of the investigation.  It

therefore cannot be said that they took no action to cause her termination.  *Compare Penley*, 876

F.3d at 655.  "Adverse employment action," of course, is not limited to hiring and firing, but it

also includes other "more than *de minimis* or trivial" action.

A reasonable jury could infer retaliation on the part of District Chief Gerald and Battalion

Chief Roberts because they failed to offer Roncales due process.

Because genuine disputes of material fact exist as to Defendants' collusion to remove Roncales through the investigation based on her protected activity, the Court cannot find summary judgment appropriate on Count I.

### IV. Conclusion

For the foregoing reasons, the Court will deny the Motions for Summary Judgment. (ECF Nos. 49, 55).

An appropriate Order shall issue.

/s/

M. Hannah Lauck
United States District Judge

Date: 9-30-21
Richmond, Virginia

54